EASTERN TOWNSHIPS BANK *v.* VERMONT NAT. BANK OF ST. ALBANS
and another.

*(Circuit Court, D. Vermont.* October 22, 1884.)

BANKS AND BANKING—LOAN—FAILURE OF BANK—PAYMENT.

A., the president of defendant, a national bank in Vermont, applied to the plaintiff, a banking corporation in Canada, for a loan for his railroad of $50,-000, which he had been unable to obtain from defendant. Plaintiff's manager told him the money could not be loaned as an individual loan, as its individual loans were too near the limit allowed by law, but that it would deposit that amount with defendant if desired. A. assented, and they agreed the deposit should draw interest at 6 per cent. while it remained, and that bonds should be deposited as security. Plaintiff drew two drafts for the amount on a Boston bank, delivered them to defendant and received the collaterals, and entered the transaction on its books as a loan to defendant. Defendant indorsed the drafts, forwarded them to the Boston bank, from which it received credit for them, and has always retained their avails. About a year afterwards defendant failed, and a receiver was appointed, who rejected the claim of plaintiff when presented for payment, and defendant brought suit. *Held,* that the transaction was not a loan to A. individually, but to defendant: that plaintiff was entitled to a judgment, to be paid by the comptroller from the assets ratably with other claims; and that the amount due should be adjusted as of the time when the receiver was appointed, and so certified by the receiver to the comptroller, to be paid in due course of administration.

At Law.

*Edwards, Dickerman & Young* and *George F. Edmunds,* for plaintiff.

*George W. Hendee* and *Luke P. Poland,* for defendant.

WHEELER, J. This cause has, on stipulation of the parties in writing, been tried by the court. The plaintiff is a corporation located and doing banking business at Sherbrooke, Canada. The defendant was organized as a national bank under the laws of the United States, and located at St. Albans, Vermont. It had seven directors, one of whom resided in Montreal, Canada, and took no active part in its business. Its president owned about three-fourths of its capital stock, and was largely interested as owner of stocks and bonds in several railroads in Canada and the United States. These railroad companies were largely indebted to the defendant on paper indorsed by him, and he was individually so indebted on his own paper. As the railroad enterprises turned, the railroad companies, the president, and the defendant were badly insolvent. As was within fair expectation, they were solvent, and were supposed to be so. The president wanted $50,000 to use, and could not be accommodated with that amount by the defendant. He applied to the manager of the plaintiff, at its banking-house in Sherbrooke, for a loan of that amount, and proposed to put up bonds of one of the railroads as collateral; and probably stated that defendant had not funds from which to make the loan as a reason for applying to the plaintiff. The manager of the plaintiff told him that it had funds sufficient from which

to make the loan, and would do so, but that the individual loans were so large in proportion to its deposits in other banks, and so near the limit allowed, that the loan to him could not be made; that it could deposit in one bank as well as another, and would deposit that amount with the defendant if he desired. He assented to this proposal, and they agreed that the deposit, while it remained, should draw interest at 6 per cent., and that the same collaterals should be deposited as security. Thereupon the manager of the plaintiff drew two drafts of $25,000 each in favor of the defendant on the National Exchange Bank of Boston, delivered them to the president of the defendant, and received the collaterals, and entered the transaction in the plaintiff's books as a loan to the defendant. The president made the transaction known to the Montreal director, who made no question about it, and took the drafts to the banking-house of the defendant, in St. Albans, and delivered them to the cashier in the presence of the vice-president, who were directors, and acquainted them with the transaction, to which neither made any objection, and they received the drafts into the assets of the defendant, and credited the amount as a deposit to the plaintiff in the books of the defendant. No other such loan was ever made by the defendant; no vote of the directors was ever taken authorizing or ratifying it; and no conference was ever had among them concerning it, except as stated, and no objection was ever made by any of them to it. The drafts were indorsed in the usual course by the officers of the defendant, and forwarded to its correspondent in Boston, from which it received credit for them, and it has always retained their avails.

It is claimed that in reality this was a loan to the president of the defendant, individually, and not to the defendant, and that it was put in the form it was to avoid the limit upon individual loans by the plaintiff. But it is found, as a matter of fact, from the evidence, that the loan to the plaintiff was refused because of that limit; that the loan was made to the defendant upon its own credit as a real transaction between the two banks, and not as a cover for any other transaction, and that it was proposed by the manager and assented to by the president, and carried out between them, because it would accommodate the defendant and enable it to accommodate the president. This result was accomplished to some extent, but no loan or advancement of this amount, or of any amounts aggregating this amount, or near this amount, was made by the defendant to the president. It was enabled to accommodate him more by means of this deposit, and did so, but made no particular advance to him because he procured the deposit to be made. He was endeavoring to promote the interests of all his enterprises, including the defendant as one of them, without intending to sacrifice that to any of the others; the plaintiff's manager was intending to make what would be for it a proper loan to or deposit with the defendant. The defendant twice paid interest to the plaintiff on the loan, bringing it up to May 21, 1883,

and by letter from its cashier, twice acknowledged at other times, acknowledged the deposit.

The drafts were dated and delivered to the president of the defendant, September 20, 1882, and charged in the books of the plaintiff at the same time. They were received at the defendant's banking house, and credited to the plaintiff on its books, September 22, 1882. The defendant suspended August 6, and the receiver was appointed August 9, 1883. This claim was presented to the receiver, and was finally rejected by him, November 27, 1883. This suit was commenced January 3, and the writ served on the president and receiver January 21, 1884. It is objected in behalf of the receiver that the making of this loan or negotiating for the deposit was not within the scope of the corporate powers of the defendant; and that, if it was, it was not done so by those having the right to exercise those powers in such a case as to bind the defendant. If this was a deposit, there can be no question about the power of the association to receive it and become liable for it. To receive deposits is among the powers specifically delegated to national banks. Rev. St. § 5136, subd. 7. It was called a deposit between the officers of the two corporations. It became, in form, a deposit on the books of the defendant. It bore interest like a loan. If it was a loan, then the question is as to the power to borrow money. Among the powers of such banks specially named is that to make contracts. Section 5136, subd. 3. There is no apparent limit to this power, except that contained in section 5202. That section provides that no association shall at any time be indebted or in any way liable to an amount exceeding the amount of its capital stock actually paid in and undiminished, except for circulation, deposits, and drafts drawn against existing funds, and to its stockholders. This implies that it may become indebted within the limit, even if the power to make contracts generally should be held to apply to something else. Powers impliedly given are as well conferred as those expressly given. *National Bank* v. *Graham*, 100 U. S. 699. This debt did not come up to the limit alone, and it is not shown that there were any others of the kind to which the limit applies.

The power seems to be clear. The transaction was had with the officers usually intrusted with financial business. The president, vice-president, and cashier all participated in it. These, with the director at Montreal, made a majority of the board; and, although he did not act as a director before, he appears to have been a director in fact, if not by right; but nothing is shown why he was not a lawful director. All are required to be citizens of the United States, and three-fourths must be residents of the state, territory, or district. This director may have been a citizen of the United States, and probably was, or he would not have been elected, and enough others appear to have been residents. If this were not so, the retention of the funds is a ratification by all of the means by which they were acquired. They could not both retain the funds and repudiate the

transaction. Those who assumed to act for the defendant in the transaction were its agents, and acted as such; and, as said by Mr. Justice SWAYNE in *People's Bank* v. *National Bank*, 101 U. S. 181, "if there were any defect of authority on their part, the retention and enjoyment of the proceeds of the transaction by their principal constituted an acquiescence as effectual as would have been the most formal authorization in advance, or the most formal ratification afterwards." From these considerations it follows that there must be a judgment for the plaintiff. Execution cannot issue upon the judgment, but it is to be paid by the comptroller from the assets ratably with other claims. Rev. St. § 5236. The amount of the claims on which dividends are to be made should, apparently, be adjusted as of the time when the comptroller took possession by appointing a receiver. In this case this time appears to be August 9, 1883. The amount of this claim to that time was $50,650. The judgment is to be certified by the receiver to the comptroller, to be paid in the due course of administration. *Case* v. *Bank*, 100 U. S. 446.

Judgment for plaintiff for $50,650, to be certified by receiver to comptroller, with costs.